

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00208-CR

LETICIA NOHELY RAMIREZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CF-17-01806

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Leticia Nohely Ramirez was convicted by a Camp County jury of manslaughter[1] in the death of Saul Martinez. After our review of the record and applicable law, we affirm the trial court's judgment, because (1) Ramirez did not preserve her claims that the trial court violated her due process and due course of law rights, (2) the evidence is sufficient to sustain the jury's verdict, (3) excluding evidence of a violent altercation involving Ramirez's victim was not error, and (4) no cumulative error has been shown.

*(1)    Ramirez Did Not Preserve Her Claims that the Trial Court Violated Her Due Process and Due Course of Law Rights*

Ramirez's first two points of error complain of the trial court's ruling limiting expert testimony proffered by Ramirez. Ramirez wanted to call two expert witnesses to testify regarding Martinez's possible cause of death.

One desired expert was Dr. Ronald Tisdell, who held a doctorate in clinical pharmacology and was also trained as a forensic toxicologist. Tisdell was allowed to testify to the jury about the effects of cocaethylene, a toxic substance produced in the body when alcohol and cocaine are combined. Cocaethylene has been "determined to cause sudden death in people." Tisdell cited "one study that's demonstrated . . . up to 25 times higher risk of sudden death when cocaethylene is present than with cocaine by itself." This was excited delirium syndrome, according to Tisdell.

---

[1]*See* TEX. PENAL CODE ANN. § 19.04. Ramirez was indicted for murder, and the jury convicted on the lesser offense.

2

The trial court, however, ruled that Tisdell was not qualified to, and could not, offer testimony that Martinez's death was a result of excited delirium or opine that Martinez had a substance abuse problem.[2]

Ramirez also made an offer of proof regarding an incident in Austin in March 2017, where Martinez went from being a calm bar patron to suddenly harassing other customers and picking a fight. Martinez was arrested as a result of this altercation; at the jail, the nurse refused to admit him because of a high heart rate, and Martinez was hospitalized instead. Ramirez wanted evidence of the Austin incident before the jury so her other expert, a former medical examiner and pathologist, could consider that incident in explaining his opinion that Martinez died from excited delirium syndrome. The trial court granted the State's motion in limine, which argued that the Austin event was offered only to show Martinez's character or propensity to be the first aggressor. The trial court sustained the State's objections to the Austin event.

On appeal, Ramirez argues that the trial court's limitation on the testimony of these witnesses violated his due process rights under the United States Constitution (point of error one) and the due course of law provision of the Texas Constitution (point of error two). Nowhere in the record can we find anything close to a complaint to the trial court that comports with Ramirez's appellate complaints. A "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Ramirez never argued to the trial court that its limitations on Ramirez's proffered testimony violated her federal

---

[2]After both sides questioned Tisdell at a *Daubert* hearing, the court directly asked Tisdell if he had ever "testified in the State of Texas as an expert regarding excited delirium?" Tisdell answered, "I haven't testified concerning excited delirium. I -- during my education and during my practice, I have seen excited delirium."

due process or state due course of law rights. Nor did she urge these points in her motion for new trial. The only objections from Ramirez at trial were that she was "entitled to put on . . . [her] best defense" and that she "need[ed] this information" about the Austin event before the jury. In answering the State's objection to testimony from Tisdell, Ramirez told the trial court "*Daubert*'s[3] threshold has been met" and Tisdell's "scientific knowledge" would "assist the trier of fact."

Ramirez never made a complaint on constitutional grounds to the trial court. She therefore will not be heard to urge those arguments on appeal. "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). "Parties are not permitted to 'bootstrap a constitutional issue from the most innocuous trial objection,' and trial courts must be presented with and have the chance to rule on the specific constitutional basis for admission because it can have such heavy implications on appeal." *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018) (quoting *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012)).[4] Ramirez never complained to the trial court that the court's ruling violated her due process or due course of law rights. The court thus had no opportunity to rule on those objections, and the State never had an opportunity to answer those arguments. We overrule Ramirez's first two points of error.

---

[3]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[4]*See also Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (appellant's argument to the trial court to allow a line of testimony on basis of "credibility" did not preserve Confrontation Clause point of error).

4

*(2)     The Evidence Is Sufficient to Sustain the Jury's Verdict*

Ramirez also asserts that the evidence was not sufficient to support her conviction for manslaughter. We disagree.

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

To prove manslaughter, the State must show beyond a reasonable doubt that Ramirez "recklessly cause[d] the death of an individual." TEX. PENAL CODE ANN. § 19.04. The charge provided that, if the jurors had reasonable doubt on the indicted offense of murder, they should consider whether Ramirez "recklessly cause[d] the death of . . . Martinez . . . by choking him with her hands and arms" or by "impeding the breathing of Martinez . . . by blocking the nose and mouth of Martinez . . . by forcing his face against the ground" or both, in which case they were to find Ramirez guilty of manslaughter.

On Saturday night, September 23, 2017, Ramirez, her brother, Luis,[5] and some of their friends went to a brewery-pub in Pittsburg, then to a local bar down the street. According to Ramirez, they arrived at the pub about 11:30 p.m. Ramirez testified that she ate dinner and had two alcoholic drinks there. The group next went down the street to Jerry's, a local bar. They drank, played shuffleboard, and socialized with the victim, Martinez. Ramirez had two bourbon-and-colas and a "couple of Vegas Bomb shots."[6] Martinez stopped by the Ramirez table and visited with the group. He did shots with them. Jerry's closed about midnight. At that point, Ramirez invited some of her friends to continue the party at her house.

Martinez's older brother, Oscar, testified for the State. He said that he and Martinez were at Jerry's Bar about 10.30 p.m. or so after a long day of working with horses. Oscar observed Martinez visit the Ramirez table, as described by Ramirez.

---

[5]The reporter's record spells the brother's name Louis. But from evidence admitted, such as identifying information collected from his cell phone and Ramirez's pronunciation in one of her interviews, we believe the proper spelling is L-u-i-s, and we use that spelling.

[6]Ramirez described this shot as Crown Royal whiskey, Red Bull energy drink, and another liquor such as Malibu rum or peach schnapps.

When Jerry's closed, Ramirez and a couple of friends stopped at a convenience store for soft drinks and ice, then continued to the rural home where she lived with her parents. Some people brought beer; Ramirez had a bottle of liquor that she shared with some of the group. Martinez was invited, and Ramirez said Martinez arrived about 2:30 a.m.

According to Ramirez, the group generally hung out, chatted, and drank various alcoholic beverages for perhaps an hour or two. She described leaning against one of the guest's pick-up trucks and talking to Christian Garcia while, nearby, her brother Luis was talking to Martinez. She described Martinez as "drinking, having fun" like the others. She said she "could tell he'd been drinking" but saw nothing to indicate "he was on drugs or anything like that."[7] Asked if she knew how much Martinez drank at her house, Ramirez said he had some "Jack and Coke." She said she had a bottle of Jack Daniels whiskey, which she claimed was not big. She said that bottle was split among four people.

At some point, Ramirez noticed Martinez and Luis "disagreeing very strongly, raising their voices." She heard Martinez saying, "[L]et me get that bitch,"[8] referring to her, and her brother, Luis, protesting, "[N]o, no, that's my sister." Ramirez testified that Luis and Martinez scuffled and pushed each other and that Luis intercepted Martinez as he tried to get to Ramirez. The two men calmed for a moment, "then all of sudden, [Martinez] . . . bear hug[ged] [Luis] and

---

[7]Martinez's autopsy showed THC and cocaine in his system. Also present was cocaethylene, produced from the combination of cocaine and alcohol.

[8]Other statements in the record suggest Martinez's comments constituted threats to sexually assault Ramirez.

7

. . . pushe[d] him . . . ."[9] Martinez threw Luis into the side of a nearby truck causing a significant dent in the truck's side panel.

Ramirez went to her brother's aid. She "pulled [Martinez] back. [She] wrapped [her] arm around [Martinez's] neck and pulled him back." Luis was on the ground beneath Martinez, and Ramirez was on Martinez's back. Ramirez demonstrated her actions for the jury, which she described as "grabb[ing]" Martinez and "pull[ing] him back." Ramirez said, "I basically threw myself back. I mean, I had to use all my force to pull him back." Ramirez fell off or rolled off Martinez; then Christian "immediately jumped in." Ramirez described Martinez as being on his stomach, on the ground; and she, Luis, and Christian were holding him down. At this point, Ramirez said she did not "know if he was saying anything," but "he was making noises." Martinez continued resisting as the three held him down. Ramirez, who had worked as a jailer in Titus County, went to her room to look for a set of handcuffs. She did not find those but returned with a package of zip-ties. She tried to zip-tie Martinez's wrists to his beltloops but could not. She tried to connect more than one zip-tie together to make a longer zip-tie but was unsuccessful.

By this point, Martinez was subdued, and Ramirez and her friends tried to reach Martinez's brother or friends. Oscar Martinez later discovered he missed calls from Ramirez at 5:26 and 5:27 a.m.[10] Unable to reach Martinez's brother, Ramirez called Martinez's friend

---

[9]Ramirez estimated Luis weighed about 185 pounds. The autopsy revealed that Martinez was five-foot, eight-inches tall and weighed 225 pounds. Martinez, who was twenty-four-years old at his death, had played four years of college football.

[10]Cell phone records indicated that Oscar missed calls from Ramirez at 5:26 and 5:27 a.m. Later (the record does not specify if it came that weekend or later), Oscar received a short video recording via cell phone. This video was

8

Richard Ledesma about 5:45 a.m. Ledesma answered, and Ramirez asked him to come to her house. According to Ledesma, Ramirez told him, "[C]ome get your friend," i.e., Martinez, but she did not elaborate. Ledesma arrived about 6:00 a.m. It was very dark at Ramirez's, and Ledesma did not see Martinez until he tripped over him. Ledesma thought Martinez was passed out drunk. He asked Ramirez and the others what had happened, but they provided no answers. Around that time, he sent a photograph to Jeffery Skinner, a friend of Ledesma and Martinez. Thinking Martinez was drunk and passed out, Ledesma made light of the situation, and Skinner agreed. Asked how Ramirez was acting around Martinez, Ledesma said, "I think she was afraid and just, you know, afraid of what happened." Ledesma stayed with the group about thirty minutes. Ramirez "was talking to [Martinez], but he wasn't talking back or nothing at the time." Ledesma was "confused" and "didn't know what happened." Ledesma grew suspicious; neither Ramirez, Luis, or Christian offered any explanation about Martinez's condition or what had happened. Noticing fresh scratches on Martinez, Ledesma kept asking for an explanation, but none was forthcoming. Finally, Ledesma suggested taking Martinez home. Ledesma and the other three put Martinez in the back of Ledesma's truck; no attempt was made to get him in the cab.[11] According to Ledesma, this was "[r]ight before daylight." On the way to Martinez's house, Ledesma said he "realized [he] already made a bad decision." He began to suspect he was moving a dead body.

about twenty-seven seconds long and captured someone telling various people it was their turn to drink; Oscar said it appeared Ramirez was holding the camera to film the short event.

[11]A day later, in her second interview with Chief Deputy Randal Lain, Ramirez admitted that when they could not rouse Martinez to get him in the truck, she thought something was wrong.

On his way to Martinez's home, Ledesma called Skinner.[12]  He asked Skinner to go to Martinez's home and wake Martinez's pregnant wife, Abby.  Skinner arrived before Ledesma, Ramirez, and the rest of the group.  Ramirez said that, once they arrived at Martinez's home, Abby gave her a bottle of water, which Ramirez poured on Martinez's face; he did not respond.  At that point, Ramirez said that she realized "something wa[s] wrong."  She thought Martinez had alcohol poisoning.  At 6:41 a.m., Ramirez called 9-1-1.

Skinner testified that it was very unusual for Ledesma to call him at such an early hour, and he initially declined Ledesma's request for help.  Skinner arrived just minutes before Ramirez arrived from her house, with Martinez in the back of Ledesma's pickup.  Skinner went to the back of Ledesma's truck to see Martinez.  He reported:

> I looked over and he didn't look good.  I gave him some taps and a couple of shakes, and he -- I noticed that -- at first touch, his -- it was -- his skin wasn't warm.  It was pretty cold or cool, and it wasn't that cold of a night.  I -- I then checked for a pulse on his wrist and then his neck.  I put my hand on his chest to see if I could feel anything.

According to Skinner, several times Ramirez said Martinez had had too much to drink and they should get him to bed.  When she tried to remove dirt from Martinez's mouth and nose, Skinner told her not to touch him and that they should call an ambulance.

Paramedics arrived and, at 6:51 a.m., assessed Martinez's condition.  They ultimately determined that Martinez had already died by the time they arrived.

Martinez's autopsy was conducted by Dr. Travis Danielsen.  He described bruises, scrapes, and scratches on Martinez's forehead, back, neck, and arms consistent with the

---

[12]Ledesma called Skinner at 6:13 and 6:18 a.m. Sunday morning, September 24.

suggestion that Martinez had been in some form of altercation or restraint preceding his death. Danielsen testified that Martinez's death was a homicide caused by asphyxia. To Danielsen, the injuries suggested that Martinez had been restrained, was "not getting enough oxygen," and was "not able to breathe." Danielsen used several autopsy photographs to explain Martinez's injuries to the jury. In several areas of his shoulders, lower back of neck, and arms, Martinez had pinprick-sized hemorrhages.[13] In line with the history of Martinez's restraint before his death, Danielsen explained that such restraint could cause "increased vascular pressure[, which] will cause these small vessels to rupture and result in these pinpoint hemorrhages. . . ." Those hemorrhages were consistent with asphyxia. According to Danielsen, "He's not able to breathe. He may have had pressure on his neck. All of this leads to this increase of vascular pressure which results in the petechial hemorrhages."

The State then asked Danielsen about excited delirium syndrome, which Ramirez had raised as a potential alternative cause of Martinez's death. Danielsen explained excited delirium syndrome as

> something that's described in individuals who are aggressive, hyper-aggressive, unable to [be] restrain[ed], or unable to kind of [be] reign[ed] in, if you will. These settings often involve law enforcement attempting to restrain the person. Oftentimes at the end of this restraint, the person becomes unconscious or stops breathing. A lot of things that are associated with it are drugs, typically stimulant-type drugs.

Danielsen was not aware of excited delirium syndrome being recognized by the American Medical Association. Although Martinez's toxicology report showed a high blood alcohol content level and a "relatively low [level] of cocaine," Danielsen said these factors did not

---

[13]The technical term for these small hemorrhages is petechial hemorrhages.

contribute to Martinez's death. Also not suggesting an alternative reason for Martinez's death was the presence of cocaethylene, a by-product of the combination of alcohol and cocaine.[14] Danielsen ruled out excited delirium as having caused Martinez's death because of the "clear evidence of injury in this case." In Danielsen's "experience and education, the cases that do involve excited delirium or excited delirium syndrome, there's typically little to no injuries noted at autopsy."[15]

Addressing Paramedic Denie Cranford's testimony that rigor mortis seemed to have been present when she examined Martinez, Danielsen pointed out that, while rigor mortis typically "begins a few hours after death," the process can be accelerated by "extreme physical exertion just before death" or by "[s]timulant drugs."

Finally, Camp County Chief Deputy Randal Lain testified that he interviewed Ramirez twice in the two days after Martinez's death. Most significant to Lain was that Ramirez, in her initial statements to law enforcement at the Martinez home or in her first interview with Lain Sunday morning, did not mention having put her arm around Martinez's neck. Only after Lain interviewed other people at the gathering at Ramirez's house did he find out about Ramirez's neck hold on Martinez. Confronted at her second interview about this, Ramirez said she did not tell Lain earlier because she was scared. Ramirez told Lain that they had not called the police when Martinez was lying on the ground because she did not think he was seriously injured.

---

[14]THC was also found in Martinez's toxicology report.

[15]The autopsy also indicated that Martinez had a slightly enlarged heart; Danielsen testified that that did not contribute to Martinez's death.

12

The evidence showed that various people, including Ramirez and Martinez, had been drinking alcoholic beverages from about 10:30 or 11:30 p.m. Saturday night until somewhere between 2:00 and 4:00 a.m. Sunday morning. It is not clear how much anyone drank or that anyone drank consistently throughout the night and early morning. Ramirez claimed Martinez went from engaging in regular conversation with Luis to suddenly rushing to attack her and from wrestling or fighting with Luis to being so violent that three people had to basically pile on to him to subdue him and get him to the ground. Ramirez acknowledged having her arm around Martinez's neck for some period as part of the melee, and she acknowledged that choking or impeding someone from breathing could kill that person. At the autopsy, Martinez was observed to have dirt in or around his mouth and nostrils. Danielsen explained that asphyxia could have been accomplished by compressing Martinez into the ground or by having pressure around his neck.

The evidence was sufficient to support the jury's verdict that Ramirez was guilty of manslaughter. We overrule this point of error.

*(3)    Excluding Evidence of a Violent Altercation Involving Ramirez's Victim Was Not Error*

Ramirez also challenges the trial court's exclusion of proffered testimony about an incident in Austin about six months before the gathering at Ramirez's house in September 2017. Ramirez offered testimony from Edgar Uribe, a bartender from Austin. Uribe testified about a night in March 2017 where Martinez was a customer at Uribe's bar. In an offer of proof, Uribe said that Martinez was "a nice guy" who ordered alcoholic beverages over "an hour or two." Martinez left and returned between half an hour to an hour later, when he "started causing

13

trouble" and was "going after one of [Uribe's] regular[]" customers. Uribe spoke to Martinez outside the bar and calmed him some.[16] Nonetheless, Martinez went back into the bar, heading for the customer he had been bothering. Uribe then "tripped" Martinez and "tied him with [Uribe's] belt." Uribe described Martinez in this encounter as having "a lot of energy" with "heavy breathing" and as "sweating like crazy . . . all over the place." He said that Martinez's "heart was racing."[17]

Law enforcement arrived and arrested Martinez. Ramirez introduced, for purposes of the offer of proof, the Austin Police Department's incident report. The report stated that, at the Austin jail, the nurse refused Martinez admittance based on "high heart rate." Ramirez presented no evidence that Martinez was on cocaine or had cocaine in his system that March night in Austin. Ramirez urged admission of Uribe's testimony in support of her defensive theory that Martinez died from excited delirium syndrome. As described above, Danielsen described excited delirium syndrome as occurring in situations where a person, who is perhaps on stimulant drugs or is obese, dies suddenly after having been restrained in some manner. Danielsen also testified that, unlike Martinez in this case, excited delirium syndrome cases seldom involve "injuries noted at autopsy."

Ramirez wanted this testimony presented to the jury so that she could elicit an opinion about the relevance of this incident to the opinion of Dr. Besant-Matthews, a retired pathologist and medical examiner called to testify as part of Ramirez's case-in-chief.

---

[16]Martinez "bought a few people some drinks."

[17]Uribe could feel this as he held Martinez down. He stated, "[H]e was, like, breathing hard. He looked like he had just run a mile."

14

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g))). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

Ramirez has failed to demonstrate that the trial court abused its discretion in excluding this evidence. Beyond his testimony to the jury, on an offer of proof, Besant-Matthews conceded that, even if he was not allowed to consider Uribe's testimony, his conclusions about Martinez's death would probably not change. There was no evidence of cocaine in Martinez's system during the Austin event. Danielsen had testified that Martinez's injuries were different from those of a person whose death was attributed to excited delirium. Danielsen also testified that, to his knowledge, excited delirium syndrome had not been acknowledged by the American Medical Association. The trial court's evidentiary ruling was not "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor*, 268 S.W.3d at 579.

We overrule this point of error.

*(4)     No Cumulative Error Has Been Shown*

Ramirez also claims cumulative error.  This argument is predicated on this Court finding error in some or all of her appellate complaints.  "It is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).  However, where an appellant fails to show error in separate claims, no cumulative harm is show.  *Buntion v. State*, 482 S.W.3d 58, 79 (Tex. Crim. App. 2016) ("appellant has failed to prove error concerning each of these claims separately, and so we find no cumulative harm").  *See Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000) (where allegations of constitutional violations are unproved, "no 'cumulative' harm could have occurred").

Since no claimed errors have been found, we overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     September 1, 2020
Date Decided:       December 1, 2020

Do Not Publish

16